County and Cross County and Victoria Los Angeles County and Cross County are going on behalf of the accountant Cross County Attorney Brian H. Schroeder are going on behalf of the County Cross County Attorney David C. Keenan. All right. We understand that you have come to a resolution with our keeper of the clock that you'll both speak for 15 and 15 subject to our stopping you or letting you go longer and then three minutes each for rebuttal purposes or cross appeal purposes. Yes. I think you'll be right back. So Mr Schroeder. Thank you. Section 60 of the Civil Union Act says that civil unions lawfully legally entered into another jurisdiction quote shall be recognized in Illinois as a civil union unquote. The Supreme Court's decision in Hayashi versus Illinois Department of Special Regulation analyzes essentially civil language and came to the conclusion that that language means there's a prospect of only application of the statute. The Hayashi court construed a statute there that talked about people who have been convicted of certain criminal offenses and if they were in fact convicted of those offenses their medical license shall by operation of law be revoked without a hearing. And the Supreme Court in Hayashi in paragraph 24 of its ruling said that the use of the word shall in that statute was a as a court use that is a very plain expression of intent that that statute applied prospectively only. The language in the statute in Hayashi is equivalent to the language of issue in Section 60 of the Civil Union Act and therefore just as Hayashi said that that was a plain expression of an intent of prospect of application only and the revocations therein would occur on the effective date of the statute. The same holds true for Section 60 of the Civil Union Act. The state of Illinois recognizes civil unions as of the date of the enactment of the Civil Union Act which was June 1st of 2011. What about the language of the act that says that the act should be liberally construed to give effect to its purposes? I have no problem with that but that, you know, liberal construction does not allow a court to ignore the plain language of a statute. You know, liberal construction is not a tool to rewrite an otherwise plain and unambiguous statute. And again the Hayashi court said using the word shall was a plain expression of a legislative intent. We have that very same word here and what we submit is a very same expression of legislative intent. It's clear as day and a liberal construction of the act cannot, again, you know, be used as a means to undo or rewrite or disregard a plain language of a statute. Let me ask you this. What do you make of the language that says the phrase in the statute legally entered into in another jurisdiction? Entered into would have been a passed act, would it not? Yes, it would. And the statute in Hayashi had essentially similar language about anyone who has been convicted of certain criminal offenses. And the Supreme Court in Hayashi said that phrase has been convicted or in the Civil Union Act legally entered into defines the class of people to whom it applies. It applies to anyone who was convicted of an offense in Hayashi at any point in time at all. The same holds true for the phrase legally entered into. It, of course, means prior civil unions because until Illinois enacted the Civil Union Act, there were no such, there were no Illinois civil unions. So the language there of legally entered into says these are the civil unions that this act will apply to. You know, whatever goes on after today's date in Illinois under the law and any that have happened anywhere else, obviously meaning Illinois of course recognizes that civil unions had occurred in the past in other jurisdictions. They wanted to sweep those prior civil unions within its scope. But that does not define what this case is about, which is when does Illinois recognize them? Let's ask it. How about this? The, hypothetically, the couple of Marys engages in the civil union in Vermont and then moves to Illinois. And then there's a decision they're going to dissolve the civil union. Do we recognize the civil union only from the time that Illinois recognized civil unions? Or do we recognize civil unions from the time of the inception of that union in Vermont where the couple first engaged in civil unions? You would recognize it in Illinois when Illinois first recognized civil unions. Even though they lived together in a civil union legally in another state for years, hypothetically? Yes. We would not recognize the laws of Vermont and give full faith and credit to those laws. Well, that's the rub. Under the Nevada v. Hall and the Feretti case from this court, Illinois can only give full faith and credit to other state sections when they do not conflict with Illinois's own Illinois public policy. And there is the Illinois public policy in regards to civil unions is expressed in Section 16. Doesn't the language of the act then provide for that, though? We're going to recognize civil unions legally entered into in other jurisdictions. So if it was legally entered into in Vermont when that hypothetical couple first engaged in their civil union, wouldn't we have to give that civil union recognition because it was legal when it was entered into in Vermont? And that's not reading anything into the act. It was legal in Vermont, but it was not legal in Illinois. Illinois did not recognize civil unions. The act says legally entered into in another jurisdiction. Correct. And, again, that is, as was an issue in Hayashi, that's defining the… Well, Hayashi is different because it's talking about convictions, past convictions, not a relationship between two people. It's about licensing, correct? It's a licensing statute, yes, but the language is the same about has been convicted. What does that mean? And the court said that meant anyone who's been convicted before, during, or after the effective date of the statute. That same language or equivalent language is in Section 60, so we think the same results should obtain that the act was intended to apply to all civil unions anywhere entered into. In Hayashi, was there any language in the act that set forth the liberal construction requirement? No, and as a licensing statute, as a statute governing an administrative practice, I would think there wouldn't be because… Right, and this is an act governing relationships between two people, two consenting adults, correct? It is. So why didn't the legislature say that? They could have easily said we will recognize them, other civil unions or mayors in other states, after the effective date of the statute. This would have eliminated this whole issue, wouldn't it? I think a lot of… They didn't say that, though, did they? Well, I think there's probably legions of cases that talk about how additional or more careful legislative drafting would have avoided a lot of judicial determinations about legislative intent. But the intent is still there because while they didn't say it under Kaveny and the statute on statutes, when there is no clear expression of legislative intent as to prospective or retroactive application, it is not just presumed. The intent is there because that's what Section 4 of the statute says. You're citing Hayeshi, but is this issue really that novel? Are you aware of the Kujawinski case from the Illinois Supreme Court? Yes, certainly. That was a case in which the Illinois Marriage and Dissolution of Marriage Act, the modern divorce act, if you will, in Illinois, went into effect in 1977. Okay? I think in Kujawinski a similar argument was made. Hey, this only applies after the effective date of the statute. The Supreme Court didn't go along with that argument in Kujawinski, did they? No. The statute in Kujawinski said that the new marriage act, the current day act, applied to all cases pending as of its effective date in which no decision, final decision, had yet been rendered. And the Supreme Court was called upon to decide whether that was constitutional. So in Kujawinski there was an express statement of the new law will apply to pending cases. And the Supreme Court said we will let that happen primarily because under the old version that the current marriage and dissolution of marriage act replaced, the spouse was still subject to having some of his own property turned over to the non-property owning spouse. In other words, there was a potential for one spouse's non-marital property to be divested and transferred to the other spouse. The Supreme Court said in that circumstance when under the old law you already were at risk of losing your own individual property, applying this new act with its new definitions to you does not impair any of your property rights because you already were subject to losing that property in the first place. We don't have that here because until the civil union was recognized in Illinois, certainly there were no such rights, whether it's a matter of the then Illinois prohibition against same-sex marriages or the long-standing Illinois prohibition against common law marriages. What the civil union act is doing here is making it flat out says it's doing it is creating a civil union and making that a marriage essentially by another name because it says parties to a civil union have the same rights as spouses. Kujawinski doesn't apply here again because first of all the act doesn't apply. That particular section 801 of the marriage and dissolution of marriage act, there's nothing in there that is not in the civil union act. And even if it were it would make no sense because What is the rule of law you would like us to announce in this case? Number one, Hayashi. Based upon Hayashi, the use of the word shall in the civil union statute means that civil unions are recognized in Illinois only as of June 1st of 2011. Secondarily, the analysis we made in our appellant's brief based upon Kaveny and the traditional retroactivity analysis. If you want to assume or disregard Hayashi and say that section 60 is silent on retroactive or prospective application, you then follow Kaveny which says you then look to the statute and statutes which gives you the legislative intent, which is every law in Illinois that does not discuss retroactive or prospective will be deemed prospective only for substantive application. Creating a civil union, defining rights of parties, giving them the rights of spouses, rights to marital property, non-marital property, contribution, all those things is a substantive law. And therefore based on section 4 of the statute and statutes and Kaveny has to be applied prospectively only. So however you get there, that's the end we want. The means is obviously up to you. It brings me back to this hypothetical that engages in a civil union in Vermont and then moves to Illinois and then decide to dissolve their relationship. Your hypothetical or under your argument, we would not give consideration at all, even though the act says the Illinois Marriage and Dissolution of Marriage Act applies to civil unions. We would not apply the act to that civil union until the date that they became authorized by law in Illinois. That's your argument. Yes, it is. And isn't that inconsistent with the purpose of the act to give recognition to these civil unions and same-sex marriages and other jurisdictions? Wouldn't we be ignoring that pronouncement from the General Assembly? Again, Your Honor, no you would not because if the General Assembly wanted to include something that explicit, as Justice Hudson said, they could have. They didn't. Why they didn't, I don't know. There aren't any debates I found where they talked about when do we want this recognition, what about civil unions that we know already exist, and what do we want to do about it. You raise a good point. Did anybody attempt to check the legislative history of this act? Mr. Ainley, in his brief, talks some of the legislative history, but the history that's quoted in their brief talks about how we want to, you know, this is a civil rights issue. It's equal rights for same-sex couples. No history that was cited in their brief, and I don't think there is any history. Honestly, I think the General Assembly probably would have wanted to duck the whole issue personally. I don't know about that issue. But, again, the fact that there is no history, and I mean, Hayashi itself says, and Kujawinski, I think, involved a savings clause, so to speak. The tools were there for the General Assembly to do something had they wanted to do so. There are cases, Kujawinski again being one of them. Hayashi said, you know, had the General Assembly wanted this statute to only apply to people convicted after its effective date, they would have said so. There was a way to do it. My point is the General Assembly had the means that for whatever reason they didn't utilize them. But when they don't do that, when the General Assembly does not take the time to say this is really what we mean about already existing civil unions or prospective retroactive application, you have to file a section four of the statute on statutes. And that's the General Assembly's intent, because that's the law that's been on the books for over 100 years, unchanged. If we applied the rule of law that you're looking for, that shall means the date of the act, then we are disregarding another part of that act. And isn't there not also an obligation that we have to not interpret things to eliminate other portions of the act or to make our decision absurd? Certainly. That's a cardinal rule of statutory construction. And if I may ask, are you talking about the legally entered into provision? Yes. Correct. Okay. You got to construe statutes in parameteria and consistently with each other so that you have a harmonious whole and take everything in context. Certainly. But legally entered into, again, is a way to explain that the General Assembly wanted their act to apply to civil unions entered in other jurisdictions in the past. Not that, you know, and that's an issue separate and distinct from when does Illinois recognize them. And Illinois chose to recognize them only as of the effective date of the act. But if a civil union is recognized, if it was legally entered into in another location, that civil union, it is presumed, will be accumulating things, buying things, selling things, owning things, not owning things. What are we supposed to do with those things prior to the time of the act when they entered into a legal union or a legal civil union and were told, as a result of that, you are now a married couple? Well, first of all, factually, that's not what we have here. The parties both freely admitted in their testimony that they knew. The only reason they went to Vermont was because civil unions were not available in Illinois. They both treated their finances completely separately. They maintained separate bank accounts. Not totally. No, they had a joint account for common expenses, but they did not have a single joint account as you would so the, quote, traditional married couple would have a single account in both parties' names. That wasn't true here. They had a joint credit card that they used for common expenses. I'm not sure if we have traditional anymore anyway. That's why I said quote. Because I don't believe most people have their own accounts or whatever. But the reality is they did not treat themselves as married or civil unions. They knew it was not allowed in Illinois. That's why they went to Vermont. They came back here and did nothing different. They filed separate tax returns because they couldn't file a joint return. Then why did one party maintain the steady employment at Bridgestone with a retirement account for the party's retirement? Because they were planning a future together. I'm not saying that they were just roommates living in an apartment together. Then your argument about separate accounts really doesn't hold a lot of water, that they were planning to be together. They were planning to be together, but that's different from feeling or recognizing that what they were doing in Illinois was legally recognized at the time. You can plan. I can have a plan. I can plan my future with anybody. It doesn't mean that I have a basis or an expectation that we have a legally binding relationship with each other. It depends on where you are. That's the difference. But if they bring these things with them and go back to Justice Burkett's, they've lived in Vermont for a while. They bring a business with them. Illinois, what does Illinois do with that business? If this provision about legally entered into does not have any impact on a decision of this nature? If they had lived in Vermont, well, factually our parties here went to Vermont for like two days and came back to Illinois. But if under Justice Burkett's hypothetical, my answer is the same. Illinois would not recognize their civil union until or would only recognize it as of June 1st of 2011. If they want their civil union treated as a factor from the date they entered into Vermont, then they should go back to Vermont and reestablish residence and divorce out there. But Illinois has spoken. The General Assembly has spoken. Again, you can construe the Civil Union Act liberally. Certainly do. So that's what it says. But that's not carte blanche to rewrite other portions of the statute. We're not rewriting it. It's already there. It says legally entered into in other jurisdictions. It doesn't say legally entered into as of this date. Well, the next clauses shall be recognized in Illinois as a civil union. So that's where we may be party companies. I think that when you read the two together, that's what it means. And, again, the purpose is applying the act. We're going to legally recognize those civil unions and same-sex marriages entered into in other jurisdictions. That's what the whole purpose of the language is, isn't it? To recognize it. But, again, when? And to apply the act. To apply it, yes, but as of what point in time? That's the key. I mean, that's, you know, it's not, you know, I'm distinguishing between the two. Certainly only want to recognize other civil unions. We're supposed to avoid, as Justice Hutchinson alluded to, unjust results. That's also a cardinal rule of statutory construction. Let's think about what you're suggesting. I think you're conflating the status of people in the union, when you say recognize, with the operation of the act on existing civil unions. If the civil union was recognized and was valid in another state, the parties come into Illinois, the act should operate on a union. Why would you want to have this artificial date and throw chaos into the law? Now we start looking at the accumulation of assets after this effective date of the statute. Even though these people could have been in a civil union or a marriage in another state for years. Why would we want to do that? Why not make it just very simple and very clean? It applies to civil unions that are in existence when Illinois recognizes civil unions. Why not just apply that? Well, because in our view, that's not what the law says you to do. We're to interpret the law and apply it. Wouldn't this result in chaos? Wouldn't this result in now the courts have to sit there and try to figure out between certain dates what happened before and what happened after? In a way, I guess you could argue it would be cleaner because you have a fixed date. You go from today forward, June 1st of 2004, no must, no fuss. It's not cleaner because you've got to distinguish, under your theory, of when the act applied to the assets between the parties. Any assets acquired before the effective date are that person's sole non-civil union property. Would you agree that oftentimes it's hard to determine what is the date of the acquisition of this particular piece of property? For example, opening of a business, was it the date that you rented the storefront? Or was it the date that you got your license from the Secretary of State to do business in Illinois? You understand what I'm saying? I do. When was this ring purchased? When did you get this high board? When did you purchase this furniture? And for every asset, you'd have a court saying, well, when was it acquired? For every asset, you'd have to have a different kind of determination. What receipt do you have? Do you understand the point? I do. That could be the same circumstance. It's almost impossible to apply the law to those assets. I would submit it's not impossible, Your Honor. If you wanted to use the date of their civil union, you could still have a situation where someone, in your hypothetical, obtained a license to incorporate a company, but a week after civil union opened up a storefront or signed a contract to conduct business. You're going to have to somewhere along the line, a line's got to be drawn, whether it's the one that we submit to General Assembly, Drew, or the date of the civil union. You're still going to have those scenarios where courts are going to have to grapple with those issues. Isn't there a better public policy involved here at all? Why would we want to do that? If the goal is to be fair and equitable in treating relationships the same, why not treat it like we do in the marriage and dissolution of marriage? Why do we want to carve out distinctions? Why do we want to do that? Because that's the way we, in our view, that's the way the law is written, and we're stuck with what the General Assembly wrote. That's like being fair? Well, the General Assembly did what it thought was best, and it's not your job to rewrite the law to make it more fair. It's your job to interpret and apply the law as written, and our contention is the way the statute's written. It has no, I shouldn't say no, Hayashi shows that it is supposed to be prospective only. Alternatively, Kavanaugh in Section 4 of the Statute and Statutes shows that it should be applied prospectively only. And I wouldn't dare actually further add, in 2014, I think, when the General Assembly abolished the ban on same-sex marriage and allowed for same-sex marriage, they amended Section 6 of the Act and broke out, initially it had said, same-sex marriages or civil unions legally entered into in another jurisdiction shall be recognized only. They broke those two sentences out but kept the same language. So, again, they had a chance to amend and say, but we wanted to apply it to everything and didn't. What about the certification requirements for a civil union? You have to certify that you haven't been, or if you have been, that that civil union's been dissolved before entering into a civil union in Illinois, correct? Yes. Well, if civil unions were not, they didn't matter, Illinois doesn't recognize them, why would you have to certify that you've dissolved your other civil union if we didn't recognize them in Illinois? They've been recognized as of June 1st of 2011. But that's not what the Act says. It's any civil union. It doesn't say any civil union entered into after the effective date of the Act. It's any civil union. The Act says, in the event either party was previously married or entered into a civil union of substantially similar legal relationship, provide the name, et cetera. It doesn't say after the effective date of this Act. It says any civil union. First of all, Doesn't that run counter to your argument? No, it does not, because it's a separate section of the Civil Union Act. It's not at issue here. Don't we read all the provisions of the Act in period material to determine the intent of the Act? You're supposed to, but does the use of the phrase any civil union in the certification requirement, again, in our view, allow you to trump or rewrite whatever adjective you want to use the language of Section 60 that says shall be recognized in Illinois? In that regard, I would simply point you toward a case that both my colleague and I are familiar with, called Toftoy, that any means any. That was the bottom line in that case. You probably don't know about it because it's an agriculture case, but the Supreme Court says any means any. There's also cases where the Supreme Court says shall sometimes mean may. But you're saying shall means shall here. I know. I'm saying any means any here. I assure you I'm saying shall means shall because the Supreme Court said it does. All right, Counsel, you have an opportunity for response. Thank you, Your Honors. Mr. Amey. Are you going to tell us you don't agree with his interpretation? Yes. Oh, you should have said maybe, really. What an heightened intrigue. Good morning, Justices. My name is David Amey of the law firm Katzen-Stefani, and I am here on behalf of Deborah Hamlin, the appellee and the cross-appellant. You've just heard a lengthy argument. I just want to start out by saying the plain language and legislative intent of the Civil Union Act provides that all civil unions lawfully obtained in other jurisdictions will be fully recognized by Illinois law and dissolved pursuant to the Illinois Marriage and Dissolution of Marriage Act, no different than any other marriages. But what is important that we follow up on here, though, is that in this case the trial court got that right, but the trial court abused its discretion in dissolving or dividing the civil union property in a 73-27% split. And I'd like to turn... But yet the court used, that's where there's maybe some confusion, the court used what he believed to be the Marriage and Dissolution Act and tried to use the formula as if the marriage was legally entered into when it was. But where did he go wrong? Well, to begin with, we can turn to paragraph 9.4 of the judgment for dissolution itself, and that's found in appendix A-1 of the appellant's brief. And the standard here for this division of property is abuse of discretion, and it's very clear that abuse of discretion is when no reasonable person would have distributed the property in the same manner as the trial court. And obviously each case rests on its own facts, so let's look at the facts of this case and the findings of this court. And again, paragraph 9.4 of the judgment, the court started out by saying, in this case, the parties, by entering into a civil union, obviously had the intention that their relationship was more than a financial arrangement. Otherwise there would be no purpose to the civil union. And I think that touches on what you addressed earlier when questioning counsel about the intent of the act and the factual situation here. It doesn't matter whether they had separate checking accounts and whatnot. The court found that they had a purpose for entering into the civil union, and it was more than a financial arrangement. The court went on in paragraph 9.4 of the judgment to state that, quote, their contributions to the arrangement went beyond the finances of the union, and those contributions must have value. So again, in this case, the court found that contributions encompasses all of their conduct, not just one specific asset or one specific account or one specific business. Yeah, I found that somewhat intriguing. The court recognized seemingly that Cigna was a successful business, and obviously the respondent, you know, started the business, was becoming a successful business, recognized that on the other hand, though, as you would with a divorce case, that the other partner's contributions in allowing that to go on were helpful. So he seemingly hit on an important factor that even though you could say the other party was not necessarily actively on a day-to-day basis involved with the business, it was important to get that support so the business could flourish. And yet, at the end, he seemed to go off on a tangent and minimize that. Is that what happened? Yes, and that's why it was abuse of discretion, because getting back to paragraph 9.4, the court went on on that same point to say, to argue that each party keeps whatever they earned would be akin to treating them as two strangers sharing an apartment lease. And he went on to say, that is not what occurred here. They intended to be more than a partnership, and that cannot be ignored, even if their contributions beyond finances are difficult to identify or value. And that's where we get into the partnership of marriage, the partnership of civil unions. The court made those findings, and when you read those findings and then you look at the result, that's the abuse of discretion here. Because no reasonable person could read those findings and then come to the conclusion that the court made on the division of property here. Because let's go back to the words again. When the trial court said that that cannot be ignored, the trial court did ignore those factors. Because if you look at the property division, and the property division is set forth in Article 11 of the judgment, paragraphs A and B, and again that's found in Appendix A-1 of the appellant's brief. When you look at that property division, straight down the line, every single asset was divided and allocated based on title. Who had title? Ms. Vasconcellos, she received everything titled in her name, and Ms. Hamlin received everything titled in her name other than the $75,000 payment. And how is that justified in this process? I don't know. That's why it was abuse of discretion. Because when the court says that these contributions must have value and that you don't treat these people like strangers, that their civil union did mean more than roommates, looking at this property division, if the parties had no civil union and they were just roommates and they split up, this is how they would have split up. But for the $75,000 payment, they would have gone their separate ways if they had no legal relationship that's recognized in Illinois, and that's not true because we had a civil union. It was recognized in Illinois. It was validly entered into in Vermont. Aren't some of those non-marital? Is that all marital property? This is just the marital sheet. There were some findings about non-marital, and the court looked at assets that were acquired prior to the entry of the civil union in 2002 and considered those non-marital. The court followed the Illinois marital distribution. So even though those are ostensibly marital assets, you're saying essentially the titles were in the respective parties' names. Absolutely. These were all found to be marital assets. And, again, that's why it's abuse of discretion because it doesn't reconcile with the court's own findings. Because, again, the court made a finding that the civil union had purpose, but the court divided the assets as if the civil union hadn't. What was the percentage? I thought I read somewhere in the briefs or something. What's the overall percentage that was divided between the misbanded and plain? Seventy-three percent to Ms. Vasconcellos and 27 percent to Ms. Hamlin. But more egregious than that, because when I argued the motion to reconsider and the court said, Counsel, you're just getting tied up with numbers, it's not even the numbers that matter. It's the types of assets, even, that makes it even more abuse of discretion. Because we look at, again, look at the property awards. Of Ms. Hamlin's property that she was awarded, 62 percent of that property was retirement accounts that were tied up that she couldn't use, can't use until she retired. Sixty-two percent of her award were retirement. Conversely, if you look at what Ms. Vasconcellos received, she received the business itself, Cigna. But the business, that was a liquid asset, because the court made a finding that valued it at what he called book value. What about that issue, the valuation? The valuation is a tricky issue in this case, because the court was correct in saying this is a business that has certain risks, that has an uncertain future, and I don't think that that was a wrong finding. You're not challenging the book-finding basis? No, because the – And how would that be an abuse of discretion anyway? That's not – a reasonable person would go with the book value, isn't it? Exactly. Or could go with the book value. But the importance of the book value here is compared to, say, for example, a case like the Rossi case, which was cited in our brief, and I believe it was also cited by the other side, where there was a disproportionate split in that case, and the husband received a greater proportion of the marital estate, but he received the business and some real estate. But in that case, the business and the real estate were not liquid. They were being valued on something other than an asset base. They were being valued on an income approach. In this case, the fact that the court valued CIGNA on an asset approach means that this business could have shut down the day of the trial and there was $1.2 million of cash sitting there. Nothing was hypothetical. Nothing was based on future performance. There was $1.2 million of cash, and the court broke that out in the judgment itself, and it was just bank accounts. One account alone had $835,000 in it. So the business didn't even need to continue operating to have that value. In fact, it was almost a liquidation value because even the inventory of the business at the time, their own expert said that the inventory was purchased for $500,000 or $534,000. He only valued it at $54,000, 10% of the actual value. It was even something less than pure asset value. It was almost a liquidation value. Well, you know as an experienced attorney, though, the case law is complete with reference to Illinois law does not mandate a 50-50 split. Absolutely not, and I agree 100% with that concept because that's not what Section 503 requires. What Section 503 requires is a detailed analysis of all of the factors, and that's not what the court did here. The court made those findings that I referenced in paragraph 9.4 but then never went on to apply. There's no evidence at all in the judgment that the court went on to apply any of the factors other than one, which was a contribution, claiming that my client did not contribute and didn't even apply the contribution factor across all the asset classes. He only applied that contribution factor to what happened to be the most valuable asset, the $1.1 million of cash tied up with the business. So that's, again, that's part of the error here. The error, I'm not saying that there should be any certain conclusion here, that this was a 60-40 split, a 55-45 split. I can tell you, though, that if there were a 50-50 split, Ms. Hamlin would have been entitled to another $473,000 out of this civil union estate, and clearly when there was $1.2 million in cash in the business, a check could have been written for that amount. This was not a case where there was no liquidity to make her whole. So whether it's a 55 or a 60-40, whatever the percentage is, the court erred in analyzing their union as being more than being roommates but then treating them just like roommates. So you're asking us to, first of all, apply the law to the union as it existed before, and you don't agree with his effective argument, obviously, correct? No, and I can get into, if you have any specific questions on it, I can get into how the Hayashi case, I think it probably is relevant here because this statute clearly says that this is the legislative intent and the temporal range of this is legally entered into, legally entered into back in 2002. Like Hayashi that says he has been convicted of it. Yes, exactly, it's the same thing. And it's the same thing here where Hayashi makes one very clear statement that just because a new statute upsets expectations based on prior law, and that's what you have here, you see it in the briefing, you saw it in the testimony of Ms. Vasconcellos, where her expectation may have been different prior to the enactment of our Civil Union Act, but so what, that doesn't matter. In the nature of domestic relations law, as we all know, people get married in different states and they move around. It all depends on where they end up as to how the dissolution is going to be treated because in some states there is no marital or non-marital property, such as Vermont. It all gets lumped in and the court doesn't have full distribution. Some states like California, it's an on-property 50. Well, let me ask you this. So you're asking us then if we would agree with your arguments to remand it for what purpose? And have the judge go back and look at his statements in paragraph 9.4 and go through all of the elements in section 503 of the Illinois Marriage and Dissolution of Marriage Act, which incorporates the duration, the contributions, the future earning potential, all of the different elements within 503 to consider all of those elements and then make a decision. Well, something that seemed to be an overriding concern, or the court mentioned it, that there would be this FDA crackdown and CIGNOT was going to go belly up and so your client's future income earning was much greater than the respondent's future income earning potential. And that was an improper basis based on the way the court valued CIGNOT because that would be possibly a valid point for the court to make if the court valued CIGNOT on an income approach and said, okay, we predict, because our valuation expert did that. He came up with a $1.7 million value and it was based on a 10-year income stream and it was based on future performance of the company. Since the court already discounted this value of the business down to what essentially was just the bank accounts, it's improper then for the court to say that somehow in the future some of this money would have to be used for other reasons. Again, that goes to the abuse of discretion because in essence by taking that position, the court is discounting it twice. CIGNOT was fairly innovative at the time it happened. Did your business appraisal take into account that there would be competition and probably significant competition? Sure, absolutely, and that was part of his valuation methodology. It's irrelevant in the end because the court didn't, by valuing it at asset value, it doesn't matter what the competition, it doesn't matter what the future performance of the business is. None of those things are relevant because you have $1.2 million of cash sitting in the bank and the act requires the property be considered the values as of the time of judgment. So it didn't really matter in that valuation approach. The asset approach to business valuation makes it essentially irrelevant whether there's competition, makes it irrelevant as any other aspect of it. But again, arguably the reason that the entire asset went to the other party is because there were going to be these expenses that were clearly identifiable, and so that's what you're disagreeing with in the book value of CIGNOT. Well, that was abuse of discretion by the court because, again, what the court did was if the court's going to value the asset, the business, just on the value in the bank accounts, the court can't then say that that same money is now going to have to be used for some hypothetical future litigation costs or whatever. And there was no evidence in this case. It was all hypothetical. Again, this was a small business that was run as a mail order and a retail site. It's not as if this was Philip Morris fighting the FDA. That was kind of an illusory argument to begin with, the trial. But I accept the court's valuation, even though I don't necessarily agree with it. Even at that valuation, clearly this is abuse of discretion by giving everything to one side. And by the time of the actual judgment in this case, how many freestanding or retail spots were here in Illinois, two or four? I'm confused about that. I believe there were three in process at the time of the trial. And as far as what happened after that, I didn't follow the business after the trial. Thank you. You will also have your additional time after Mr. Kroger finishes. Thank you. I'm going to try not to talk like an auction broker just because I have a limited time, so hopefully I can be intelligible. A few things about the retroactivity analysis. If the parties had wanted to develop their civil union before June 1st of 2011, they could not have done it in Illinois. So to talk about the expectations of the parties, I think that has to be taken into consideration, too. They knew what they were doing in Illinois did not have any legal effect. So to say that they still thought it had legal effect or they should be treated as having acquired civil union property at a time when Illinois didn't recognize it, wouldn't even let them go into court and get a divorce, a civil union dissolution, so to speak, counts for something. They knew that what they did in Vermont didn't mean anything in Illinois. And that has to be considered when you evaluate the statute. But if they wanted to enter into any other civil union here afterwards, they would still have had to go back and do something with the Vermont civil union. They wouldn't have had to because they could have registered their Vermont civil union in Illinois and it would have been recognized as of June 1st of 2011. I mean, I know this is kind of a chicken, egg, and cat, mouse kind of thing, but that's the way the law is written. The law has to be applied as it is. If the General Assembly wanted to do something different, they had not just one when they enacted the statute, but a second opportunity when they amended it again in 2013 or 2014 to say we wanted to apply backwards in time as well. So all you people that lived in Illinois knowing your civil union didn't matter in Illinois, all of a sudden now the property you may have acquired, instead of thinking it was yours, it's now equally shared by you and your civil union partner, they could have done that. They didn't. So then you've got to fall back on the traditional retroactivity analysis, which is Hayashi and Kaveny and the statute on statutes. Mr. Ailey said that the judge did not consider any statutory factors. If you look at pages 904, 920, and 941 of the record when he ruled on a motion to consider, one of the factors I'm supposed to look at is contributions to the parties. Ms. Hamlin was working in a separate job earning a full-time wage. There's one factor right there. She did not put in a significant amount of actual effort to CIGNAT. There's another factor right there. With respect to one asset? Well, you know, I think counsel's point is you can't just apply that contribution factor to one asset. Here you have to because CIGNAT was basically the only asset of value. It was worth $1.2 million. Ms. Vasconcellos, if you accept under the trial court's allocation, she got like about $1.4 million of assets. So CIGNAT really is the only meaningful substantial asset that we're fighting about here at the other. So, again, generically you're correct, but here this was the big thing. This was the big ticket, and everything else was secondary by comparison. And for seven years, Petitioner outperformed your client in terms of contributions to the civil union. I don't know if you say outperformed. She probably outperformed because Ms. Vasconcellos used the home equity line of credit on her residence to cover any shortfalls in her expenses. The trial testimony is that she alone paid for the residence. The trial court also found that CIGNAT was founded late in the civil union. It was founded in September of 2009, so for the first quarter, for the last quarter of 2009, it basically was open and didn't have a lot of profits, something that, again, the judge factored in his ruling that it came late in the marriage, late in the civil union. Is there any case law to support that you treat an asset acquired later in the relationship differently than an asset that's acquired at the inception, for example? I can't set you a case law. I can say that in an equitable distribution of property, someone who forms a business close to the end of the relationship, where by all definition because it's only like 16 months before the civil union dissolution proceeding was filed, that CIGNAT was actually up and running and making money, that, you know, equitably speaking, why should the person who was there for the 16-month span who, by her own testimony, did nothing more than make change and pick up product and help move the company across the street, how does that equate to giving her a $400,000 or $500,000 share of the company? This is an abuse of discretion standard. I don't have to prove I'm right. I don't even have to prove that you would have, you know, it doesn't even matter if you would have ruled differently than the trial court did. What is the standard is could no reasonable person do what the trial court did. If you look at the record and the judge's statements, he considered the factors and came to a thoughtful, reasoned decision. Do you have any case, any case, that would support a 73-27% split on an asset like? Yes, Rossi and Wright that I cite in my reply brief. It was like a 69 or 71% split where one of the parties, the husband in that case, was the driving force behind the success of a business, and the court said he made the business. He did the work. He put in the time doing it. So the court there affirmed an allocation of basically a 73% split. What did you think of the trial court's, in this case, alluding to the fact that he recognized the contribution of the plaintiff, recognized that, you know, that allowed the business to flourish, if you will, because of the support in their relationship? Is that not to be gendered? Well, I think it's a matter of like a generic statement versus an actual concrete examination of what the parties actually did. In any relationship, they support each other. You know, civil union, marriage, whatever, there's this abstract level of support, companionship, affection. But what was done, who formed the business, who actually made it happen, and who was, so to speak, a bystander? Well, would she have been able to run the business and have it flourish without the other party doing the things to keep the household going and the other things to allow the business to flourish? I would submit yes. Is that his argument going to be? Well, I'm sure it's going to be, but the testimony is that Ms. Vasconcellos used her own money, her line of credit, which undisputedly would be a non-civil union asset, and her business income when needed to pay the household expenses for her residence. They shared grocery expenses, but I don't think you can equate, you know, mowing the lawn, buying groceries, and doing dishes with saying I deserve $400,000 of your now successful company, when, again, her testimony was I made change for people who came to the house, I moved you across the street. How is this any different than arguments about wives who put their husbands, who work, take care of the kids while they're going to law school, medical school, getting their MBA? What you're arguing here now is those contributions don't mean anything. No, I'm not. Well, it sounds like it to me. It does sound like it, and I will gladly clarify if I can. Please. In those cases, you're talking about a long-term situation where the husband presumably was for years building a business and never home and needed to be away a lot, so the wife had to stay at home. This, again, SIGNET was founded in September of 2009. Ms. Hanlon filed for dissolution of the civil union in, like, June or July, I think, of 2011. This was not a long-term situation where Ms. Hanlon dedicated her life to basically making, to freeing up Ms. Bessie Sellers. Well, what was your client doing before this happened? Odd jobs. She was doing odd jobs and using her line of credit. She was refinancing her personal residence. But she was eating. She was eating, yes. And she was keeping the house. She had another business early on that was making some money, but she wasn't making anywhere near, of course, the money she made with SIGNET. But that's my answer, is that this was an 18-month endeavor, and it was not as if Ms. Bessie Sellers would have been on the street homeless if it wasn't for Ms. Hanlon's efforts. She did have assets and money of her own. She was able to support herself. Any questions? Thank you, Your Honors. Mr. Amick. Thank you. This all gets back to the abuse of discretion. And I listen to all of those questions, and I've been doing this for a long time, domestic relations law, and those are all very good questions because we see it in traditional opposite-sex marriages all the time where those things happen. Somehow in this case, even after the court making those findings about this civil union being more than just roommates, somehow this court treated this marital estate differently, and I argued this in the motion to reconsider. The only thing different I could see in that case, and in this case factually, was that it was a same-sex couple. That was the only thing I could see to explain it. Counsel made a very good point. We talk about asset class, and again, that's part of the abuse of discretion. And in this point, it cuts the opposite way. I think Ms. Hamlin should have had to transfer some retirement money over to Ms. Vasconcellos, and that's something the court can take care of on remand when it applies all the factors because if you look at the balance sheet of the findings here, Ms. Hamlin received $290,000 of retirement money, and that retirement money was marital, and it was accrued during the course of the civil union. Well, some of it was. Well, that was all marital. That was all marital, $290,000 of retirement money. So for the court to apply all the factors, typically what the courts do is balance not only the overall numbers but also the asset classes because retirement money is different than cash. It's not available now. Exactly, and in this case, maybe half of the retirement money should have gone from Ms. Vasconcellos or from Ms. Hamlin over to Ms. Vasconcellos because that was accrued, again, during the civil union in an equitable distribution. Everybody's supposed to be somewhat equitable here. So move the retirement money over to Ms. Vasconcellos. The business, which was created after seven years of this civil union relationship, was a gold mine, according to the testimony. It was akin to winning the lottery, so Ms. Hamlin should be able to share in some of those lottery winnings just like in those actual published lottery cases. So, again, that just points more to how the trial court really abused its discretion by not applying any of those equitable factors in just dividing things solely 100% by title as opposed to looking at the types of assets, the liquidity, the nature of it, and making an equitable distribution by applying all of the factors of 503 and not just looking at one factor of contribution to the creation of that business and not just looking at one factor or one asset. Remember, this is the partnership theory of marriage, the same partnership theory to civil union that the court really found in paragraph 9.4. Now, listening to your argument, I think it's more powerful at this point, as both of you were orally, but is the bigger problem with the trial court's decision its inconsistency in these are the things that happened, but this is what I'm going to do, and ignoring those or just not going through the proper distribution factors? Well, it's both, and that's a counsel-raised-to-the-raw situation. And the reason I ask, there are lots of cases on the application of the factors. There are lots of cases. Absolutely. Not many cases on the issue of the inconsistent findings. Absolutely. Counsel cites the Rossi case where, again, I said earlier that that was a case where the person who got a greater percentage got all the illiquid assets. On the Wright case, it was a three-and-a-half-year marriage. So every case stands individually on its facts. So the key here is the result may not be abuse of discretion. It's always difficult in these cases to say what is abuse of discretion, because there is no clear standard in matrimonial law when dividing assets, because there are varying cases with varying percentages. So you have to look at the facts of this particular case, and the best place to look at the facts of this individual case is to look at the court's own findings as to what this court believed were the facts, and that, again, is found in paragraph 9.4 of the judgment, where the court specifically said you cannot ignore these other factors. You cannot ignore the fact that these people were more than just roommates. And that's the abuse. He divided the estate as if they were roommates. And it can't be any more simple than that to show the abuse of discretion. And whether his decision was colored by other aspects of the case, such as the civil union versus a traditional marriage, I don't know. But he got it wrong. He got part of the analysis right. And then he just froze up and punted on the assets and said, well, I don't know what to do. I'm just going to give these to whoever they're titled in. And that's abuse of discretion. That's not what the court is supposed to do. He didn't actually say that, but that's what happened. We did, yes. I mean, that's what we see on paper. But he didn't say his decision wasn't this is, you know, he never said anywhere in his spoken word or in anything that he edited in your written words. This was titled anew, or is this what just happened? In fact, he backtracked when I argued the motion to reconsider. He came up with some more explanations on the contribution issue that were never even in the original judgment. But, again, the strongest indication of whether a reasonable person would have distributed the property in this manner is to look at the court's findings of what the court found and then look at the result. And if those two don't connect, that's abuse of discretion, because that's not something a reasonable person would do. A reasonable person would connect the dots and make a finding, an ultimate finding, consistent with the initial finding, not something totally unrelated and totally inconsistent. That's where the abuse is. All right. Next question. Justice Burkett. All right. Thank you. Thank you, gentlemen, for your argument here today. We will take the matter under advisement, and a decision will be made in due course.